**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

DISCOVER FINANCIAL SERVICES, DFS
SERVICES, LLC, and DISCOVER BANK,

                    *Plaintiffs,*

           v.

VISA U.S.A. INC., VISA INTERNATIONAL
SERVICE ASSOCIATION, MASTERCARD
INCORPORATED and MASTERCARD
INTERNATIONAL INCORPORATED,

                    *Defendants.*

-----------------------------------------------------------------x

**SECOND AMENDED**
**COMPLAINT**
**AND JURY DEMAND**

**Case No.  04-cv-7844 (BSJ)(KF)**

**ECF Case**

On October 7, 1998, the United States sued Visa and MasterCard for unlawfully restraining trade by "adopting rules and policies that disadvantage or exclude rival general purpose card networks." In that case, *U.S. v. Visa and MasterCard*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), the Court entered a final judgment holding that the implementation and enforcement of Visa Bylaw 2.10(e) and MasterCard's Competitive Programs Policy ("CPP") -- rules that preclude virtually all American financial institutions from issuing credit cards, travel and entertainment cards (or "charge cards")[1] and debit cards over the Discover network -- violated Section 1 of the Sherman Act. In reaching this judgment, the Court found that:

- Visa and MasterCard, individually and collectively, possess and exercise market power in the general purpose card network services market;

- 2.10(e) and the CPP have harmed competition in the general purpose card network services market;

---

[1]     Credit and charge cards are together referred to as "credit cards."

89713.3

- 2.10(e) and the CPP have injured Discover by precluding bank issuance of Discover credit and debit cards;

- There is no legitimate business justification for 2.10(e) or the CPP; and

- Visa International "encouraged" Visa U.S.A.'s implementation and enforcement of 2.10(e) and thus is also liable under Sherman Act Section 1.

The Court enjoined the further enforcement of 2.10(e) and the CPP. The United States Court of Appeals for the Second Circuit affirmed the final judgment and denied defendants' motion for rehearing and rehearing *en banc. See U.S. v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003). The United States Supreme Court denied defendants' petition for a writ of *certiorari. See --* U.S. --, 125 S. Ct. 45 (October 4, 2004)

Discover now seeks treble damages for the substantial injuries it has sustained as a result of the implementation and enforcement of 2.10(e), the CPP and other unlawful and anticompetitive practices.

\* \* \*

Plaintiffs Discover Financial Services, DFS Services, LLC, and Discover Bank (collectively referred to as "Discover") upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, alleges as follows:[2]

## I.    SUMMARY OF CLAIMS

1.    In exercising their substantial individual and collective market power, Visa and MasterCard adopted and predatorily enforced their anticompetitive rules to the detriment of consumers, competition and Discover. These rules suppressed and limited Discover's share of

---

[2]    Defendants Visa U.S.A. and Visa International are together referred to as "Visa." Defendants MasterCard International and MasterCard Incorporated are together referred to as "MasterCard."

89713.3

the general purpose credit card market to approximately 6% since 1994. They also blocked Discover from participating altogether in the general purpose debit card market.

2.    If not for defendants' anticompetitive rules, third-party financial institutions -- including some of the largest banks in the United States -- would have issued credit and debit cards over the Discover network ("Discover Cards"). Third-party issuance of Discover Cards would have resulted in significantly greater consumer use and significantly greater merchant acceptance of Discover Cards. But for these rules, Discover would have captured far greater market shares and been far more profitable.

3.    Defendants' anticompetitive rules have harmed Discover, competition and consumers and have reinforced defendants' individual and collective dominance in the relevant markets.

4.    To remedy the substantial injuries it has sustained from defendants' anticompetitive conduct, Discover seeks treble damages under federal antitrust law.

## II.    JURISDICTION AND VENUE

5.    This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 and state law, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and 2202. This Court has supplemental jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1367.

6.    Defendants transact business and are found in this District. The interstate trade and commerce involved and affected by the alleged violations of federal antitrust and state laws

89713.3

-- namely, trillions of dollars worth of credit and debit card transactions -- was and is caused in part within this District. The acts complained of have had, and will have, substantial anticompetitive effects in this District. Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22 and 26.

### III.   THE PARTIES

7.     Plaintiff DFS Services, LLC ("DFSLLC") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Riverwoods, Illinois. DFSLLC owns a general purpose card network and offers general purpose card network services to banks and merchants. DFSLLC also is affiliated with plaintiff Discover Bank, a bank that is chartered under the laws of Delaware which issues Discover-branded credit cards to consumers. DFSLLC and Discover Bank are wholly-owned subsidiaries of plaintiff Discover Financial Services, a corporation organized and existing under the laws of Delaware.

8.     The predecessors-in-interest of DFSLLC, Discover Bank and Discover Financial Services were wholly-owned subsidiaries of Sears, Roebuck and Co and thereafter Dean Witter Discover & Co. Dean Witter Discover merged with Morgan Stanley & Co. on May 31, 1997. The merged entity became Morgan Stanley in 2002.

9.     Defendant Visa U.S.A. is a non-stock membership corporation organized and existing under the laws of Delaware with its principal place of business in Foster City, California. Visa U.S.A. offers general purpose card network services to issuing and acquiring banks. At all times relevant to this action, Visa U.S.A.'s owner/member banks have included thousands of banks, virtually all of which also have been (and currently are) owner/member banks of MasterCard. The rules and policies of Visa U.S.A., including the rules and policies at

89713.3

issue, are a product of the collective action of its owner/member banks.  In *U.S. v. Visa and MasterCard,* the Court stated that "[b]ecause the owners of the associations are also the customers, and vice versa, the associations are necessarily consensus-driven." 163 F. Supp. 2d at 333.  In addition, the Court stated that the defendants' "20,000 [owner/member] banks set [their] policies . . ." *Id.* at 242.

10.    Virtually all United States payment card-issuing banks have been owner/member banks of Visa U.S.A. during the time period relevant to this action.  Upon information and belief, banks continued to join Visa U.S.A. as owners/members during the time period relevant to this action.

11.    Defendant Visa International is a membership corporation organized and existing under the laws of Delaware with its principal place of business in Foster City, California.  Visa International conducts and transacts business within the United States.  In particular, Visa International has ultimate authority over various activities of Visa U.S.A.  Specifically, in *U.S. v. Visa and MasterCard*, it was held that "Visa International . . . ha[d] the authority . . . to preempt or regulate the Visa U.S.A. Regional Board" with respect to its adoption and enforcement of 2.10(e). 163 F. Supp. 2d at 406-07.

12.    Visa U.S.A., Visa International and many of their owner/member banks are doing business within this District.

13.    Defendant MasterCard International is a membership corporation organized and existing under the laws of Delaware with its principal place of business in Purchase, New York.  MasterCard offers general purpose card network services to issuing and acquiring banks.  At all times relevant to this action, MasterCard's owner/member banks have included thousands of

89713.3

banks, virtually all of which also have been (and currently are) owner/member banks of Visa. The rules and policies of MasterCard, including the rules and policies at issue, are a product of the collective action of its owner/member banks.

14.    Virtually all United States payment card-issuing banks have been owner/member banks of MasterCard during the time period relevant to this action. Upon information and belief, banks continued to join MasterCard as owners/members during the time period relevant to this action.

15.    Defendant MasterCard Incorporated is a corporation organized and existing under the laws of Delaware with its principal place of business in Purchase, New York.

16.    On or about June 28, 2001, MasterCard International merged with a subsidiary wholly-owned by MasterCard Incorporated. Since that time, MasterCard International has been the principal operating subsidiary of MasterCard Incorporated.

17.    MasterCard Incorporated, MasterCard International and many of their owner/member banks are doing business within this District.

## IV.    CO-CONSPIRATORS

18.    Defendants adopted and enforced their exclusionary rules and other unlawful and anticompetitive rules as a result of intra-association conspiracies or combinations among and between their owner/member banks.

19.    Bylaw 2.10(e) was adopted by Visa in combination with its owner/member banks. Upon information and belief, Visa had the authority to and did regularly review and revise its bylaws throughout the relevant time period but at no time repealed Bylaw 2.10(e). Similarly, the CPP was adopted by MasterCard in combination with its owner/member banks. Upon

89713.3

information and belief, MasterCard had the authority to and did regularly review and revise its membership policies throughout the relevant time period but at no time repealed the CPP.

20.    These exclusionary rules of "cohesion" were collectively adopted and enforced in order to ensure that Visa and MasterCard owner/member banks stay "loyal" to each other through a concerted and anticompetitive refusal to do business with competing networks, including Discover.

21.    In *U.S. v. Visa and MasterCard,* the district court held that "By-law 2.10(e) and the CPP are restrictions *of, by and for* the member banks." 163 F. Supp. 2d at 400 (emphasis added). Further, in *U.S. v. Visa and MasterCard,* the Second Circuit held that Visa and MasterCard "are not single entities; they are consortiums of competitors. They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions" and that, through their exclusionary rules, each Visa and MasterCard owner/member "agreed not to compete with the others in a manner which the consortium considers harmful to its combined interests." 344 F.3d at 242. The Second Circuit also held that defendants' exclusionary rules are *"horizontal restraint(s) adopted by 20,000 competitors." Id.* (emphasis added).

22.    Defendants also adopted and enforced these unlawful and anticompetitive rules pursuant to inter-association conspiracies and combinations between and among Visa U.S.A., Visa International and MasterCard. These combinations and conspiracies were facilitated by the virtual identity in Visa and MasterCard ownership/membership of card-issuing banks and the substantial overlap in the banks that govern Visa and MasterCard.

89713.3

23.     Various persons, firms, corporations, organizations and other business entities, some known and others unknown, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of these conspiracies.  Co-conspirators whose identities are.presently known include, but are not limited to, certain owner/member banks of Visa and/or MasterCard.  These banks, along with the defendants, are responsible for the adoption and enforcement of defendants' exclusionary rules.

## V.    FACTUAL ALLEGATIONS

**A.    Visa and MasterCard have been dominant payment card networks.**

24.     Throughout the relevant time period, Visa and MasterCard have possessed substantial individual and collective market power in the relevant markets.  In *U.S. v. Visa and MasterCard,* the Court held that "both defendants have market power in the general purpose card network services market, whether measured jointly or separately." 163 F. Supp. 2d at 342.

25.     Visa and MasterCard's substantial (individual and collective) market power has been protected by high barriers to and the extreme difficulty of entry in the relevant markets.  As the Court stated in *U.S. v. Visa and MasterCard*, "there are significant barriers to entry in the general purpose card network services market." 163 F. Supp. 2d at 342.  Because of these entry barriers, Discover has been the only successful new network market entrant since the 1960s.  Other major firms, including General Electric, AT&T, General Motors and the Ford Motor Company, considered entering the network services market, but declined to do so, instead opting to join Visa and MasterCard.

26.     Visa and MasterCard's substantial (individual and collective) market power is evidenced by their historic market shares (in terms of purchase volume).  In 1994, for example,

89713.3

Visa's individual share in the general purpose credit card market (in the United States) was 43.9%. Visa's combined share with MasterCard, which is owned and controlled by the same banks that own and control Visa, was 72.1%. As of January 2005, Visa's individual share had increased to 50%, and the Visa/MasterCard share has increased to 79%.

27.    Visa and MasterCard's substantial (individual and collective) market power is also evidenced by the fact that they have not lost merchant acceptance despite their repeated and significant interchange increases. In *U.S. v. Visa and MasterCard,* the Court noted that "Visa and MasterCard have recently raised interchange rates charged to merchants a number of times, without losing a single merchant customer as a result." 163 F. Supp. 2d at 340. Throughout the relevant time period, MasterCard's market power was also evidenced by the fact that it did not experience any significant drop in merchant acceptance despite the fact that its credit and debit interchange has been consistently priced higher than Visa's.

28.    Visa and MasterCard's substantial (individual and collective) market power has been reinforced by their implementation and enforcement of 2.10(e), the CPP and other unlawful and anticompetitive rules, which have excluded competing networks from critical segments of the relevant markets.

## B.    Discover has been precluded from having Discover Cards issued by third-party banks.

29.    A basic way for payment card networks to compete and to expand card issuance, use and acceptance is through issuance of their cards by third-party banks. In *U.S. v. Visa and MasterCard,* the Court stated that, for networks, "acquiring additional issuers leads to increased card issuance." *Id.* at 387. Visa and MasterCard have grown primarily through bank issuance of their cards.

89713.3

30.    Large commercial banks -- all of which are members of Visa and/or MasterCard -- have been and are critical distributors for payment card networks.

31.    Third-party issuance of cards offered by various general purpose card networks has also increased competition among banks.  One basic way that banks compete has been by segmenting their payment card portfolios across different networks.  Such segmentation has allowed banks to supply a panoply of different payment card offerings to their customers, thereby increasing overall issuer revenue, output and consumer choice.  By the early 1990s, virtually all of the major card-issuing banks in the United States pursued a strategy of segmenting their issuance between Visa and MasterCard (and, in the case of Citibank, among Visa, MasterCard, Diners Club and Carte Blanche).

32.    To block Discover from competing and expanding its network by third-party bank issuance, Visa enforced 2.10(e) and Visa International "encouraged" such enforcement.  In *U.S. v. Visa and MasterCard,* the district court held that  "Visa International not only had the power to preempt Visa U.S.A.'s exclusionary rule, but also provided affirmative encouragement for the illegal bylaw . . ." 183 F. Supp. 2d 613, 617 (S.D.N.Y. 2001).  MasterCard enforced a similar rule that was formally incorporated into the CPP in June 1996.

33.    2.10(e) states that:

> the membership of any member shall automatically terminate in the event it, or its parent, subsidiary or affiliate, issues, directly or indirectly, Discover Cards or American Express Cards, or any other card deemed competitive by the Board of Directors.

The CPP states that:

> [w]ith the exception of participation by members of Visa, which is essentially owned by the same member entities, members of

10

89713.3

MasterCard may not participate either as issuers or acquirers in competitive general purpose card programs.

34. These rules precluded banks from continuing to issue cards over the dominant Visa and MasterCard networks while also issuing Discover Cards. In other words, member banks were required to choose to issue either Visa and/or MasterCard cards or, alternatively, Discover Cards and/or cards from other Visa/MasterCard competitors.

35. These rules did not permit banks to even test whether Discover Card issuance would have been profitable while they continued to issue Visa and/or MasterCard cards. Therefore, it was impossible for Visa or MasterCard members to assess whether partial or total conversion of their portfolios to Discover would be profitable.

36. These rules began to have a severe adverse impact on Discover's growth in or about 1993 when Discover's growth as a single issuer network slowed and it pursued third-party issuers to sustain growth. In this time frame, to diversify the cards issued over its network and to attract third-party issuance, Discover adopted its NOVUS network strategy. This strategy was designed to encourage third-party issuers to issue over the Discover/NOVUS network due to its greater efficiency, lower cost, innovative and issuer-centric network brand strategy, and greater flexibility for issuers to brand and differentiate their own products.

37. If not for the exclusionary rules, Visa/MasterCard banks would have opted to issue over the Discover/NOVUS network because of these network benefits and Discover's exclusive acceptance at important merchants, such as Sam's Club, other warehouse clubs and Sears.

38. Visa/MasterCard owner/member banks would have also begun to issue cards over the Discover/NOVUS network because of the defendants' lack of responsiveness to many of the

89713.3

banks' complaints. For example, many important banks desired the greater flexibility and opportunity to differentiate their products -- particularly, by emphasizing their own branding over their affiliated network's branding. At or about this time, certain Visa/MasterCard member banks -- such as Citibank -- publicly expressed dissatisfaction over the subordination of their individual promotion strategies to the brand and advertising of Visa and MasterCard. According to these banks, because of the defendants, the brands of Visa and MasterCard dominated bank issuing brands in the minds of consumers. While defendants did not significantly alter their advertising and promotion strategies in response to these complaints, Discover adopted its NOVUS strategy, in part, to satisfy issuer demands concerning the balance between issuer and network brand and promotional strategies.

39.     In a speech on May 1, 1996 to banks, William Hodges -- the Executive Vice-President in charge of the Discover/NOVUS network -- explained and affirmed Discover's commitment to the NOVUS strategy. He said:

> So we propose a new model for the credit card industry. A model in which card [issuer] Brands, not Networks, are the dominant force . . . *Where issuers choose freely what channels of distribution they will employ . . .*
>
> . . . we propose that each issuer choose its own array of products *and the networks over which to offer them.*

(emphasis added).

40.     Despite the Discover/NOVUS network's greater efficiencies and Discover's offer that banks issue over its network in a manner that would accentuate bank branding over network branding, Visa/MasterCard banks did not contract with Discover because of defendants' exclusionary rules. According to the district court in *U.S. v. Visa and MasterCard,* "the exclusionary rules have resulted in the failure of Visa and MasterCard members banks to become

12

issuers" on Discover's network.  163 F. Supp. 2d at 383.  Similarly, the Second Circuit held that,

as a result of 2.10(e) and the CPP, "[n]o United States bank has been willing to give up its

membership in the Visa U.S.A. and MasterCard networks in order to issue . . . Discover cards."

*U.S. v. Visa and MasterCard*, 344 F.3d at 237.

41.    Notwithstanding the barriers created by defendants' exclusionary rules, Discover

persisted in offering banks flexible issuance of their cards over the Discover/NOVUS network

throughout the relevant time period.  However, as the district court found in *U.S. v. Visa and*

*MasterCard*, "defendants' exclusionary rules [] deterred United States issuers from entering into

issuing arrangements with Discover." 163 F. Supp. 2d at 386-87.

42.    The district court in *U.S. v. Visa and MasterCard* discussed specifically how

2.10(e) and the CPP frustrated Discover's ability to consummate an issuance arrangement with

First USA, which was one of the largest credit card issuers in the United States, in 1999:

> First U.S.A. approached Discover to discuss a possible issuing
> arrangement.    With defendants' exclusionary rules in place,
> Discover and First USA discussed an arrangement under which
> First USA would assist Discover in marketing Discover cards to
> First USA's affinity customers so long as First USA would have
> the right to purchase the resulting Discover card accounts when the
> by-laws were changed or eliminated.  Although First USA would
> have liked to issue Discover cards itself, it would not do so for fear
> of losing the ability to issue Visa and MasterCard cards.

*Id.* at 386-87.

43.    Discover also attempted to make deals with other Visa/MasterCard

owner/member banks, including Citibank, Washington Mutual and others.  Despite the interest

expressed by these banks in issuing Discover Cards, defendants' exclusionary rules precluded

such arrangements.  For example, a memorandum dated May 6, 2003 from a Visa/MasterCard

89713.3

member bank demonstrates how defendants' exclusionary rules ultimately made it impossible for

that bank to issue Discover gift cards despite the bank's desire to do so.  The memorandum

stated:

> As we discussed yesterday afternoon, we petitioned Visa for an
> exception to their bylaws so we could participate in the proposed
> Discover/Wildcard gift card program.  Visa initially told us no and
> we provided them additional information hoping to move them our
> way.  However, on Friday, our Visa Relationship Manager told us
> the final answer from Visa's legal department was "hell no."  Their
> rationale was if they granted us an exception to issue a
> Discover/AMEX card, it would open "Pandora's Box" based on
> the status of the Justice Department's anti-trust suit against them.  I
> presented the opposite view point that an exception would show
> the Justice Department that Visa is willing to work with its
> members and is not as rigid as they presume.  My argument fell on
> deaf ears.
>
> [The bank] and Discover would make great partners, but Visa is
> not willing to play ball.

44.    Absent defendants' exclusionary rules, banks would have chosen to issue cards

over the Discover network, as Discover has had a differentiated and, in many respects, superior

network.  Third-party issuance would have caused the Discover network to expand as a result of

new, additional Discover accounts opened by these issuers.  As the Discover network began to

grow via such third-party issuance, it would have achieved even greater growth as a result of the

partial or total conversion of Visa/MasterCard card portfolios held by banks that also issued over

the Discover network.

45.    If Visa/MasterCard member banks had been permitted to issue Discover Cards,

Discover would have achieved a scale permitting it to be a much more effective competitor to

Visa and MasterCard, as banks are a "unique distribution source for general purpose card

14

products because of their experience and expertise" and "control" over depository accounts, *i.e.*, "the primary financial relationship in America." *Id.* at 383. In *U.S. v. Visa and MasterCard*, the district court stated that "[t]he exclusionary rules constrained . . . Discover's ability to grow market share." *Id.* at 382.

46.     Because 2.10(e) and the CPP have precluded Discover (and certain other competitors, such as American Express) from entering into third-party issuance arrangements with Visa and/or MasterCard member banks, competition and Discover have been directly and substantially harmed. In *U.S. v. Visa and MasterCard*, the district court held that "defendants' exclusionary rules undeniably reduce output . . . restrict competition between networks and harm consumers by denying them innovative and varied products . . . " In affirming the district court decision, the Second Circuit held that: "Without doubt the exclusionary rules in question harm competitors." *U.S. v. Visa and MasterCard*, 344 F.3d at 243.

47.     By precluding Discover from entering into such third-party issuing arrangements, defendants' exclusionary rules have resulted in fewer Discover Cards being issued and utilized.

48.     In addition, fewer merchants have accepted the Discover Card than would have done so in the absence of these exclusionary rules.

49.     Further, due to the defendants' exclusionary rules, consumers have perceived that the Discover Card has been accepted at far fewer merchants than has actually been the case. In *U.S. v. Visa and MasterCard*, the district court stated that the Discover Card "suffers from a [consumer] perception gap (based on its lower [merchant] acceptance in the past) that places it at a competitive disadvantage . . ." 163 F. Supp. 2d at 388.

15

89713.3

50.    The depressed card issuance and merchant acceptance caused by 2.10(e) and the CPP have reduced Discover Card transaction volume to a level significantly lower than it would have been in the absence of these rules.

51.    Had it not been foreclosed by defendants' exclusionary rules from contracting with Visa/MasterCard owner/member banks, Discover would have benefited from the enormous growth of the general purpose credit card market in the 1990s.  This market expansion was spurred by the proliferation of rewards, co-branding and affinity programs and portfolio acquisitions by the larger credit card issuers -- market developments that Discover was well positioned to exploit.  In 1993, when Discover launched its NOVUS strategy, the total purchase volume for general purpose credit card transactions in the U.S. was approximately $426 billion.  By 2003, purchase volume had increased to $1.29 trillion.  Because of the exclusionary rules, Discover was largely shut out of this growth.

52.    In *U.S. v. Visa and MasterCard*, the district court summarized how Discover has been foreclosed and competition has been harmed by these rules:

> [T]he [exclusionary] rules restrain competition in the network market because they prevent . . . Discover from offering network services to the consumers of those services, the members of the Visa and MasterCard associations.  As a result, . . . Discover [is] forced to operate as [a] single-issuer network[], limiting [its] transaction and issuance volume and stunting [its] competitive vitality.    Network services output is necessarily decreased and network price competition restrained by the exclusionary rules because banks cannot access the . . . Discover network[] . . .

163 F. Supp. 2d at 379.

53.    The damaging impact of defendants' exclusionary rules on Discover's growth is apparent from an examination of Discover's stagnant and declining share of the general purpose

89713.3

credit card market.  In 1994, Discover held a 6% market share.  As of January 2005, its share had declined to approximately 5.7%.

54.    Enforcement of 2.10(e) and the CPP has also harmed competition between and among banks by preventing banks from segmenting their credit card portfolios in accordance with consumer demands.  In *U.S. v. Visa and MasterCard,* the district court stated that:

> restricting banks from issuing on the American Express or Discover networks restricts the choices available to them and their customers, who might prefer a combination of services on their American Express or Discover card which are now unavailable. Through the exclusionary rules, Visa and MasterCard also limit competition among member banks by preventing them from competing against each other by offering their customers Amex and Discover brands and network features.

163 F. Supp. 2d at 382.

## C.    Discover has been unlawfully precluded from settling debit card transactions.

55.    By-law 2.10(e) and the CPP have also barred Discover from entering the increasingly important and rapidly expanding general purpose debit card market.  Between 1994 and 2003, that market grew over 2000% in terms of purchase volume and over 1800% in terms of number of transactions.  By 2003, that market accounted for $580 billion worth of purchase volume.

56.    A debit network must have access to bank asset accounts.  Since Visa and MasterCard owner/member banks control virtually all such accounts, 2.10(e) and the CPP have barred Discover from entering the debit market.

57.    Discover has worked on various ways to overcome the barriers to debit entry erected by defendants.   One efficient way for Discover to have entered and participated in the debit market would have been to offer a signature-based or "off-line" debit card to consumers

17

89713.3

and merchants that was issued by a third-party bank that maintained depository accounts. Discover was prepared to enter and participate in that market with its existing network in or about 1993, when the debit market began to experience explosive growth. Discover was well-positioned to so enter the debit market, particularly in light of its low-cost merchant pricing and acceptance advantages in debit-intensive merchant categories, such as warehouse clubs and supermarkets.

58.    As Visa and MasterCard did, Discover could have easily extended its network into signature debit without altering its network significantly to do so. Defendants' exclusionary rules, however, precluded Visa/MasterCard members from giving Discover access to their depositors' asset accounts for the purpose of settling signature-based debit transactions.

59.    In *U.S. v. Visa and MasterCard*, the district court summarized the ways that the defendants' rules prevented Discover from settling signature-based debit transactions over its network:

> Discover [has] studied issuing off-line debit products over [its] network[] in the United States to compete with Visa and MasterCard's virtual monopoly in this area.    [It has] found, however, that without access to banks' demand deposit accounts this is not a viable strategy. . . . Without access to bank accounts, a[] . . . Discover off-line debit card would have to be authorized and settled through the Automated Clearinghouse (ACH), an inferior system . . . . In addition, . . . Discover off-line debit cards issued without bank partners do not benefit from the essentially free distribution system of the Visa/MasterCard networks.    Bank issuers on the Visa/MasterCard networks simply attach off-line debit functionality to the ATM cards routinely distributed to most banking customers.    In contrast, . . . Discover would have to convince bank customers to take a second debit card in addition to the debit card linked to their bank accounts.

163 F. Supp. 2d at 393-94.

89713.3

60.    Discover's foreclosure from settling signature-based debit transactions has reduced the efficiency of its network by limiting its scale.  In *U.S. v. Visa and MasterCard*, the district court stated:

> The inability to provide debit functionality on a cost-effective basis further limits the effectiveness of . . . Discover as [a] supplier[] of credit and charge card network services.  Because off-line debit transactions run over the same network as credit and charge transactions, the addition of debit volume improves network economies of scale and increases network relevance.  In addition, debit functionality makes a network more attractive for consumers and banks desiring a range of products over a single brand or card.

163 F. Supp. 2d at 394.

61.    Another efficient way for Discover to have entered and participated in the debit market would have been for it to acquire a network that settled PIN-based debit transactions, such as PULSE EFT, STAR or NYCE.  Discover was foreclosed from engaging in such an acquisition strategy while the exclusionary rules were enforced because virtually all bank customers of PIN-debit networks were also Visa/MasterCard owner/member banks. Therefore, under the exclusionary rules, these banks would have been "automatically terminated" from defendants' dominant networks if they continued to issue cards over a Discover-acquired PIN-debit network.  These banks would have ceased doing business with a Discover-acquired PIN-debit network rather than sacrifice their Visa/MasterCard memberships, eliminating the business and economic rationale for such an acquisition by Discover.

62.    The foreclosing impact of defendants' exclusionary rules is further evidenced by Discover's acquisition of the PULSE debit network after defendants' exclusionary rules were enjoined.  Discover announced that it would acquire PULSE -- a scenario that was rendered

19

effectively impossible by the exclusionary rules  -- only weeks after the judgment in *U.S. v. Visa and MasterCard* became final.

63.    By blocking Discover's access to virtually all asset accounts, Visa and MasterCard have also precluded Discover from offering "relationship" cards, which provide cardholders with credit and debit functionality on a single card.  By precluding Discover from offering such innovative products, defendants have harmed consumers, competition and Discover.  In *U.S. v. Visa and MasterCard*, the Court held:

> As suppliers of DDAs, the centerpiece of the multi-function relationship cards, banks are in the best position to offer these next generation products to consumers . . . By forbidding their member banks from issuing competitors' general purpose cards, defendants' exclusionary rules thus foreclose the competitive threat that Discover otherwise might pose to that relationship card strategy.

163 F. Supp. 2d at 392-93.

64.    Recognizing the illegality of Visa's attempts to block member banks from switching debit card issuance to competing networks, MasterCard's General Counsel, Noah Hanft, advised Visa U.S.A.'s then General Counsel, Paul Allen, that "the effect of *any* prohibition on Visa's top 100 issuers from being able to switch freely to other debit brands . . . violates federal and state antitrust and unfair competition law." (Emphasis added.) MasterCard recognized that, when Visa *taxed* a bank that switched its debit card portfolio from Visa to MasterCard, Visa violated the antitrust laws.  This illegal "barrier" to competition pales in comparison to Visa and MasterCard's *insuperable* barriers precluding all third-party member banks from issuing debit cards over the Discover and American Express networks.

89713.3

65.     Because defendants' exclusionary rules precluded Discover from settling signature and PIN-based debit card transactions, Discover incurred harm and damage in the general purpose debit card and general purpose card network services markets.

66.     The exclusionary rules allowed Visa to dominate debit. In 1991, Visa had a 50.4% individual share of the debit market. In 2003, Visa had a 57.8% individual share of the debit market.

**D.     There is no legitimate business justification for defendants' anticompetitive conduct.**

67.     There has never been any legitimate business justification for defendants' anticompetitive conduct. This conduct was designed to protect Visa and MasterCard from competing on the merits and to foreclose competition in the relevant markets. It was also designed to specifically minimize Discover's growth and to coerce Discover to abandon the network market in the United States.

68.     Even in Discover's earliest years of existence (*e.g.*, 1985 through 1990), Visa persistently engaged in predation against Discover. At that time, Visa engaged in a number of exclusionary practices in order to "kill" Discover "in the cradle," including rulemaking that precluded the efficient processing of Discover transactions on the same merchant terminals as the dominant Visa and MasterCard transactions. A November 1990 document drafted by Visa consultant, Bain & Company, explained the rationale for this "anti-Discover campaign." It states that Visa's "short-term [Discover] strategy" during that time was to "[d]elay [Discover's] development of a large, high quality merchant base and thereby make the introduction of Discover more costly and unsuccessful."

89713.3

69.    Visa also publicly stated its predatory intent during Discover's early years.  A senior Visa marketing executive, Fran Schall, described Visa's intent in a speech to its owner/member banks in the following terms:

> [B]y working together, and by being pro-active rather than reactive, I think we can thwart the efforts not only of Sears but also of other outside competitors . . . .  If we are successful in responding to Sears, then other non-bank competitors who are likely sitting on the sidelines will likely think again when they try to follow Sears' lead.  If we are not successful, then there are going to be many Discovers that we are going to be hearing about in coming years.

70.    Defendants' predatory intent -- as well as the pretextual nature of the business justification for their unlawful rules and practices -- are also readily apparent from the discriminatory nature of defendants' actions.  For example, even though the Citibank-owned Diners Club and Carte Blanche networks have been direct competitors of Visa and MasterCard, defendants have never enforced Bylaw 2.10(e) or the CPP to exclude Citibank from being a member of Visa and MasterCard or from serving on their respective boards of directors.

71.    Most revealing is how Visa and MasterCard have repeatedly attempted to use their exclusionary rules to force Discover to stop competing.  Defendants repeatedly offered to repeal these rules *on the condition that Discover abandon its payment network*.  For example, in or about September 1988, Visa U.S.A. management formulated the so-called "Discover Card Conversion Project" in an attempt to convince Discover to fold its network and reissue Discover Cards as Visa credit cards.  Ten years later, Visa U.S.A. and Visa International were still trying to coerce Discover to abandon its payment network.  In December 1998, Bennett Katz -- then Executive Vice-President and General Counsel of Visa International -- invited Discover CEO

22

89713.3

David Nelms and other senior executives to "give up your business" and "come join the good guys" during a meeting held in London.

72.    Visa U.S.A. and Visa International also blocked Visa card issuance in Europe by Discover's parent, Morgan Stanley, in order to coerce Morgan Stanley to exit the payment network business in the United States. By letter dated June 28, 2002 to Discover's General Counsel, Carol Walsh -- an Executive Vice-President and Regional General Counsel of Visa International -- stated that "I am not sure there would be any benefit to entering into commercial discussions [regarding Morgan Stanley's application for Visa International membership] while [Morgan Stanley] is the owner of the [U.S. based] Discover card system."

73.    Visa knew that its exclusionary rule was anticompetitive even prior to the filing of *U.S. v. Visa and MasterCard*. In a December 3, 1997 Andersen Consulting report to Visa, the consultant stated that Bylaw 2.10(e) would be "invalidated." This report was completed *ten months prior* to the filing of the *U.S. v. Visa and MasterCard* complaint.

74.    In *U.S. v. Visa and MasterCard*, the Court found that the exclusionary rules have an "anticompetitive purpose of limiting brand competition" and that Visa and MasterCard "offered no persuasive pro-competitive justification" for their exclusionary rules. 163 F. Supp. 2d at 401, 406.

## VI.    RELEVANT MARKETS

### A.    General Purpose Card Network Services

75.    General purpose card network services is a relevant product market. "[M]erchant consumers exhibit little price sensitivity . . ." for payment of network services. *U.S. v. Visa and MasterCard*, 163 F. Supp. 2d at 338. Throughout the last decade, Visa and MasterCard have

89713.3

repeatedly imposed significant non-transitory increases in the interchange fees charged to merchants. Despite these price increases, neither Visa nor MasterCard has suffered any merchant attrition. As the Second Circuit stated, "despite recent increases in both networks' interchange fees, no merchant had discontinued acceptance of their cards. . . ." *U.S. v. Visa and MasterCard*, 344 F.3d at 240.

76.    There are no services that are reasonably interchangeable with those provided by general purpose card networks. As the district court held in *U.S. v. Visa and MasterCard,* such "networks provide card services that cannot reasonably be replaced by other sources." 163 F. Supp. 2d at 338.

77.    Visa and MasterCard have admitted the existence of a general purpose card network services market. *Id.* at 339 (Visa and MasterCard do "not dispute that they participate in a general purpose card network services market.").

78.    The United States is the relevant geographic market. *Id.* at 340-41. This was recognized by the Court in *U.S. v. Visa and MasterCard* for the following reasons. First, a "national card base and acceptance network are critical assets that a system must possess to compete, because consumers principally purchase from merchants in the same country." *Id.* Second, "significant competition among issuers -- the buyers of system services -- occurs at the national level." *Id.* Third, general purpose card networks "pursue national promotional strategies." *Id.* Fourth, 2.10(e) and the CPP affect only issuance of general purpose credit and debit cards in the United States. *Id.* Fifth, "important decisions affecting the United States, including pricing, are made by the [Visa and MasterCard] U.S. Region Board and committees." *Id.*

89713.3

### B.    General Purpose Credit Cards

79.    General purpose credit cards (referred to in *U.S. v. Visa and MasterCard* as "general purpose cards") is a relevant product market. *Id.* at 335. General purpose credit cards is a relevant market because a substantial number of cardholders do not substitute for general purpose credit card services even when significant, non-transitory price increases occur. In *U.S. v. Visa and MasterCard*, the Court held that "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such price increase unprofitable for a hypothetical monopolist of general purpose card products." *Id.* at 336.

80.    General purpose credit cards are also a relevant product market because merchants have not substituted for general purpose credit card services even in light of repeated, significant, non-transitory price increases in general purpose credit card services.

81.    Consumers do not view limited purpose proprietary or store cards as reasonably interchangeable with general purpose credit cards. In *U.S. v. Visa and MasterCard*, the Court held that "[b]ecause proprietary cards, such as a [Sears'] or Macy's card, are accepted only at a single merchant, consumers do not believe that proprietary cards are substitutes for general purpose [credit and T&E] cards and therefore they should not be included in" the relevant market. *Id.* Moreover, because of their limited acceptance, issuers do not view proprietary cards as adequate substitutes for general purpose credit cards. Moreover, because of their limited utility, proprietary cards do not constrain the prices to merchants for accepting general purpose credit cards.

82.    Consumers do not view debit cards as reasonably interchangeable with general purpose credit cards. In *U.S. v. Visa and MasterCard,* the Court held that "[c]onsumers . . . do

89713.3

not consider debit cards to be substitutes for general purpose [credit] cards. Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate [substitutes for general purpose credit cards]. Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . Knowledgeable industry executives agree with these conclusions." *Id.* at 337.

83.    Merchants do not view debit cards as reasonably interchangeable with general purpose credit cards. For example, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 WL 1712568, *2 (E.D.N.Y. April 1, 2003) the Court found that "[o]verwhelming evidence demonstrates that merchant demand for credit card services is distinct from merchant demand for debit card services."

84.    Like in *U.S. v. Visa and MasterCard,* the court in *In re Visa Check* at *3 found that "there is no genuine issue of material fact ... that [a] relevant market, at its broadest, is the provision of general purpose credit and [T&E] card services."

85.    The geographic market for general purpose credit cards is national in scope for the same reasons that the market for general purpose card network services is national in scope, as alleged in paragraph 88.

### C.    General Purpose Debit Cards

86.    General purpose debit card services is the product dimension of a relevant market. General purpose debit cards, unlike general purpose credit cards, permit consumers to pay for purchases with funds debited from their depository accounts. In *U.S. v. Visa and MasterCard,* the Court stated that "[d]ebit cards . . . promptly access money directly from a cardholder's

89713.3

checking or deposit account." 163 F. Supp. 2d at 331.

87.     Consumers who pay with general purpose debit cards either want or need to make contemporaneous payment with funds from their asset accounts. They do not want to borrow money or cannot do so. In addition, they want to avoid the inconvenience of writing a paper check or carrying substantial amounts of cash with them for purchases. For these reasons, credit cards, T & E cards, checks and cash are not reasonably interchangeable with debit cards for consumers. In *U.S. v. Visa and MasterCard,* the Court held that "[c]onsumers do not consider debit cards to be substitutes for general purpose [credit] cards." 163 F. Supp. 2d at 338.

88.     Other forms of payment, including general purpose credit cards, checks and cash are also not reasonably interchangeable with debit cards for merchants. This is demonstrated by the fact that merchants have paid and continue to pay significant, non-transitory price increases for debit card acceptance without substituting for debit card acceptance. As the Court held in *In Re Visa Check* at * 2,7, "debit card services is a well-defined submarket characterized by an inelasticity of [merchant] demand . . ." and "[o]verwhelming evidence demonstrates that merchant demand for credit card services is distinct from merchant demand for debit card services."

89.     As it is necessary to have access to demand depository accounts in order to issue general purpose debit cards and as other "pay now" payment types do not offer consumers the conveniences afforded by general purpose debit cards, such as not having to carry a check book or substantial amounts of cash, issuers do not view general purpose debit cards as interchangeable with general purpose credit cards, cash, checks or any other forms of payment. Moreover, defendants do not dispute the existence of a debit card market. As the Court held in

89713.3

*In Re Visa Check* at * 7, "debit card services [to merchants] is a well-defined submarket characterized *by* . . . universal recognition by the public, the parties, and the industry as a whole."

90.    The geographic market for general purpose debit cards is national in scope for the same reasons that the market for general purpose card network services is national in scope, as alleged in paragraph 88.

## VII.    ANTITRUST INJURY

91.    The predatory campaign engaged in by defendants has caused harm to competition and consumers nationwide in the manner described in paragraphs 24 - 84.  By forbidding Visa and MasterCard members from issuing Discover and other competitive cards, the defendants have "reduce[d] output and consumer choice." *U.S. v. Visa and MasterCard*, 163 F. Supp. 2d at 341.  Defendants' exclusionary rules have also significantly reduced "price competition" to merchants.  *Id*. at 330.

92.    Moreover, as underscored by the evidence detailing Visa's "anti-Discover campaign," Discover was and is a target of defendants' conspiracies and combinations to restrain trade and monopolize the relevant markets.  Discover has incurred direct and proximate antitrust injury through this campaign of predation.  By way of example and not limitation, in a world absent the defendants' exclusionary rules, Discover would have enjoyed increased profits due to:

a.    a substantially increased purchase volume of Discover transactions;

b.    a substantially increased share of the credit card transaction market;

c.    substantial entry into the debit card market via issuance of Discover debit cards by third-parties;

d.    increased card issuance of Discover credit cards via third-party issuance;

89713.3

e.     expanded merchant acceptance of Discover;

f.     increased positive, network externalities;

g.     a greater number of transactions being completed at merchants that exclusively accept Discover;

h.     enhanced performance of Discover Cards, including increased balances and higher cardholder activation rates;

i.     greater Discover network margins on Discover transactions;

j.     greater margins on transactions completed with cards issued by Discover;

k.     card portfolio acquisitions;

l.     new card products; and

m.     increased economies of scale.

## VIII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**(Combination And Conspiracy To Restrain Trade In
General Purpose Card Network Services Market)**

93.    Discover realleges the allegations in paragraphs 1 through 92.

94.    Defendants, on behalf of and in collaboration with their banks, have engaged in a continuing combination and conspiracy to organize and operate their general purpose card networks in a manner that restrains competition among general purpose card networks in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as amended.

95.    In furtherance of this combination and conspiracy, defendants and certain of their banks have adopted and enforced 2.10(e) and the CPP in order to disadvantage or exclude rival

29

89713.3

general purpose card networks, such as Discover's network, from the general purpose card network services market.

96.     Defendants have been able to implement and enforce 2.10(e) and the CPP because they possess economic power, both in their individual capacity and jointly, in the general purpose card network services market.  As held by the Second Circuit in *U.S. v. Visa and MasterCard*, "[w]e agree with the district court's finding that Visa U.S.A. and MasterCard, jointly and separately, have power within the market for network services . . ." 344 F.3d at 239. Defendants have possessed this substantial market power throughout the relevant damages period.  Defendants' power in this market is reinforced by the "significant barriers to entry" that characterize it.  *U.S. v. Visa and MasterCard*, 163 F. Supp. 2d at 341.

97.     This combination and conspiracy has resulted in substantial anticompetitive effects in the general purpose card network services market.  As held by the Second Circuit in *U.S. v. Visa and MasterCard*, there is "persuasive evidence of harm to competition" caused by the application of these exclusionary rules and policies, including "the total exclusion of . . . Discover from a segment of the market for network services . . . [T]here are only four major payment card network providers in the United States . . . [A]t the network level (where four major networks seek to sell their technical, infrastructure, and financial services to issuer banks) competition has been seriously damaged by the defendants' exclusionary rules." 344 F.3d at 240.

98.     There is no legitimate business justification for or pro-competitive benefits caused by 2.10(e) and the CPP.

99.     As a result of defendants' violations of Section 1, Discover has been substantially injured in its business and property.

89713.3

## SECOND CLAIM FOR RELIEF

### (Conspiracy To Restrain Trade In Relevant Markets)

100.    Discover realleges the allegation in paragraphs 1 through 99.

101.    Defendants, on behalf of and in collaboration with their banks, have engaged in a continuing combination and conspiracy to organize and operate their general purpose card networks in a manner that restrains competition among general purpose card networks in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as amended.

102.    In furtherance of this combination and conspiracy, defendants have engaged in overt acts in order to disadvantage or exclude rival general purpose card networks from the relevant markets.  These overt acts have included the adoption and enforcement of defendants exclusionary rules.

103.    This combination and conspiracy has resulted in substantial anticompetitive effects in the relevant markets.

104.    There is no legitimate business justification for or pro-competitive benefits caused by the restraints imposed through this combination and conspiracy.

105.    As a result of defendants' violations of Section 1, Discover has been substantially injured in its business and property.

## THIRD CLAIM FOR RELIEF

### (Monopoly Maintenance Against Defendant Visa U.S.A.)

106.    Discover realleges the allegation in paragraphs 1 through 105.

107.    Visa U.S.A. possesses monopoly power in the relevant markets.  Visa U.S.A. has possessed this monopoly power throughout the relevant damages period.

89713.3

108.   In violation of Section 2 of the Sherman Act, Visa U.S.A. and its co-conspirators have utilized exclusionary means to maintain a monopoly in the relevant markets, including the implementation and enforcement of 2.10(e).

109.   These acts of monopoly maintenance have caused substantial anticompetitive effects in the relevant markets.

110.   There is no legitimate business justification for or procompetitive benefits caused by Visa U.S.A.'s exclusionary rules.

111.   As a result of Visa U.S.A.'s violation of Section 2, Discover has been substantially injured in its business and property.

### FOURTH CLAIM FOR RELIEF

### (Attempt To Monopolize Against Defendant Visa U.S.A.)

112.   Discover realleges the allegations in paragraphs 1 through 111.

113.   In violation of Section 2 of the Sherman Act, 15 U.S.C. §2, Visa U.S.A. has willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the relevant markets.

114.   This combination and conspiracy to monopolize the relevant markets has been effectuated by overt exclusionary acts, including the implementation and enforcement of 2.10(e).

115.   There is a dangerous probability that Visa U.S.A., by its exclusionary rules, will monopolize the relevant markets.

116.   Visa U.S.A.'s exclusionary rules have caused substantial anticompetitive effects in the relevant markets.

89713.3

117.    There is no legitimate business justification for or pro-competitive benefits caused by Visa U.S.A's exclusionary rules.

118.    As a result of Visa U.S.A.'s   violation of Section 2, Discover has been substantially injured in its business and property.

### FIFTH CLAIM FOR RELIEF

### (Conspiracy To Monopolize)

119.    Discover realleges the allegations in paragraphs 1 through 118.

120.    In violation of Section 2 of the Sherman Act, defendants and their co-conspirators have willfully, knowingly, intentionally and with specific intent to do so, combined and conspired to monopolize the relevant markets.

121.    The combination and conspiracy to monopolize the relevant markets has been effectuated by the means and the overt acts set forth above, among others.

122.    As a result of the conduct alleged herein, defendants and their members have been able to exclude competitors and competition in the relevant markets.

123.    There is no legitimate business justification for or procompetitive benefits caused by defendants' exclusionary rules.

124.    As a result of defendants' violations of Section 2, Discover has been substantially injured in its business and property.

### IX.   RELIEF SOUGHT

WHEREFORE, Discover requests the following relief:

33

89713.3

A.      That the Court apply collateral estoppel to the Court's Final Judgment in *U.S. v. Visa and MasterCard* and enter an Order that 2.10(e) and the CPP violate Section 1 of the Sherman Act, have injured competition and have injured Discover.

B.      That the Court declare, adjudge and decree that defendants have committed the violations of federal and state law alleged herein;

C.      That defendants, their directors, officers, employees, agents, successors and assigns be enjoined and restrained from, in any manner, directly or indirectly, committing the violations of Sections 1 and 2 of the Sherman Act, in which they and/or their co-conspirators have engaged; and that defendants, their directors, officers, employees, agents, successors and assigns be enjoined and restrained from, in any manner, directly or indirectly, committing any other violations of statutes having a similar purpose or effect.

D.      That the Court award damages sustained by Discover in an amount to be proved at trial, to be trebled according to law, plus interest – including prejudgment interest – attorneys' fees and costs of suit, and such other and further relief as this Court may deem just and proper.

89713.3

## X.    JURY DEMAND

Discover hereby demands trial by jury of all issues properly triable thereby.

Dated: New York, New York
       June 4, 2007


**CONSTANTINE CANNON LLP**

By: _____
   Matthew L. Cantor (MC-8183)
   Jeffrey I. Shinder (JS-5719)
450 Lexington Avenue
New York, New York 10017
(212) 350-2700



Of Counsel:

Kelly McNamara Corley, Esq.
Jennifer K. Schott, Esq.
James Swift, Esq.
David Oppenhiem, Esq.
Discover Financial Services
2500 Lake Cook Road
Riverwoods, Illinois 60015


**KIRKLAND & ELLIS LLP**

By: _____
   William H. Pratt (WP-5178)
   Jennifer Selendy (JS-8828
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800



**KIRKLAND & ELLIS LLP**
Michael Becker
655 15TH Street, N.W.
Suite 1200
Washington, D.C. 20005
(202) 879-5000

89713.3