**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------ X
                                 :

DISCOVER FINANCIAL SERVICES, DFS  :
SERVICES, LLC, and DISCOVER BANK,  :
                                 :     **04-CV-7844 (BSJ)(DFE)**
                Plaintiffs,   :
                                 :     **OPINION and ORDER**
       -v-                 :
                                 :
VISA U.S.A. INC., VISA           :
INTERNATIONAL SERVICE ASSOCIATION, :
MASTERCARD INCORPORATED, and     :
MASTERCARD INTERNATIONAL        :
INCORPORATED,                 :
                               :
                Defendants.  :
------------------------------------ X

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Discover Financial Services, DFS Services, LLC, and Discover Bank ("Discover") filed this private antitrust action pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking damages from Visa U.S.A. Inc. and Visa International Service Association ("Visa"), and MasterCard Incorporated and MasterCard International Incorporated ("MasterCard") for various alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Pending before the Court is Discover's motion for partial summary judgment, in which it seeks the application of collateral estoppel as to certain issues determined against Visa and MasterCard in the government's antitrust action; Visa's motions for summary judgment, in which it seeks the dismissal of claims against it

on various bases; and MasterCard's motions for summary judgment, in which it seeks the dismissal of various claims against it. For the reasons that follow, Discover's motion is GRANTED in part and DENIED in part; Visa's motions are GRANTED in part and DENIED in part; and MasterCard's motions are GRANTED in part and DENIED in part.  Visa's and MasterCard's motions for summary judgment on the "Project Explorer" damages model will be resolved in a separate order.

## BACKGROUND

This private action seeks damages based on harm to Discover allegedly caused by Visa and MasterCard through the enactment of exclusionary rules, Visa Bylaw 2.10(e) and MasterCard's Competitive Programs Policy ("CPP"), that prevented Visa and MasterCard member banks from issuing American Express and Discover cards.  The history of these rules and their effects are discussed at length in this Court's decision in the Department of Justice's ("DOJ") antitrust action against Visa and MasterCard, United States v. Visa U.S.A. Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ("Visa I"), and in the Second Circuit's affirmance of that decision in United States v. Visa U.S.A. Inc., 344 F.3d 229 (2d Cir. 2003) ("Visa II"); familiarity with these decisions is assumed.

**DISCUSSION**

Because the Court's partial grant of Discover's motion for partial summary judgment on the issue of collateral estoppel impacts Visa and MasterCard's motions, the Court addresses Discover's motion first.

I.   Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "It is the movant's burden to show that no genuine factual dispute exists."  Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  Summary judgment is inappropriate if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  "In the context of antitrust

litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct." Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, 996 F.2d 537, 542 (2d Cir. 1993).

II. Collateral Estoppel

A. Principles

Collateral estoppel "is central to the purpose for which civil courts have been established[:] the conclusive resolution of disputes within their jurisdictions." Montana v. United States, 440 U.S. 147, 153 (1979). "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Id. "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Id. at 153-54.

Under the doctrine of nonmutual offensive collateral estoppel, "a litigant who was not a party to a prior judgment may nevertheless use that judgment 'offensively' to prevent a

4

defendant from relitigating issues resolved in the earlier proceeding." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979). "Four elements must be met for collateral estoppel to apply: (1) the issues of both proceedings must be identical, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there must have been 'full and fair opportunity' for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits." Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir. 1995).

"Despite the economies achieved by use of collateral estoppel, it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results." Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1486 (2d Cir. 1995). Indeed, "unfair use of a prior determination against a subsequent litigant should not be permitted to stand." Id. For example, "it would be unfair to allow offensive collateral estoppel against a party that had little incentive to defend in the first action." Id. Nor should offensive collateral estoppel apply where "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," or "where the second action affords the defendant procedural

opportunities unavailable in the first action that could readily cause a different result." Parklane Hosiery Co., 439 U.S. at 330-31.

B.   Discover's Motion

By its motion, Discover seeks "an order establishing as undisputed the elements of Discover's § 1 claim relating to credit network services" as well as an order giving collateral estoppel effect to a variety of findings and legal conclusions it has compiled from Visa I and Visa II in its "Attachment A" to its motion.   Visa and MasterCard oppose Discover's motion contending principally, inter alia, that Discover has failed to demonstrate the prerequisites for the application of collateral estoppel and that application of the doctrine would be unfair. The Court has reviewed Visa I and Visa II in light of the applicable law and the parties' arguments, and believes that a limited order giving collateral estoppel effect to certain of the findings necessary to support the judgment, described in detail below, would promote judicial efficiency while remaining fair to Defendants.   However, for the reasons below, the Court declines to give collateral estoppel effect to the findings and conclusions articulated in Discover's Attachment A.

1.   The Findings Given Collateral Estoppel Effect

a.   The DOJ Action

In its antitrust action against Visa and MasterCard, the
DOJ challenged their governance rules and their exclusionary
rules, pursuant to § 1 of the Sherman Act.  Section 1 of the
Sherman Act prohibits "[e]very contract, combination in the form
of trust or otherwise, or conspiracy, in restraint of trade or
commerce among the several States." 15 U.S.C. § 1.  To succeed,
the DOJ bore the burden, as an initial matter, to "demonstrate
that the defendant conspirators have 'market power' in a
particular market for goods and services," and "demonstrate that
within the relevant market, the defendants' actions have had
substantial adverse effects on competition, such as increases in
price, or decreases in output or quality." Visa II, 344 F.3d at
238.  "Once that initial burden is met, the burden of production
shifts to the defendants, who must provide a procompetitive
justification for the challenged restraint." Id.  "If the
defendants do so, the government must prove either that the
challenged restraint is not reasonably necessary to achieve the
defendants' procompetitive justifications, or that those
objectives may be achieved in a manner less restrictive of free
competition." Id.

Following a thirty-four day bench trial, the Court
concluded, inter alia, that the DOJ failed to prove that dual
governance had an adverse effect upon competition, but that
Visa's Bylaw 2.10(e) and the MasterCard CPP "weaken[ed]

competition and harm[ed] consumers" by "limiting output of . . .
Discover cards in the United States," "restricting the
competitive strength of . . . Discover by restraining their
merchant acceptance levels and their ability to develop and
distribute new features such as smart cards," "effectively
foreclosing . . . Discover from competing to issue off-line
debit cards," and "depriving consumers of the ability to obtain
credit cards that combine the unique features of their preferred
bank with any of four network brands, each of which has
different qualities, characteristics, features, and
reputations." Visa I, 163 F. Supp. 2d at 329.

    To support these conclusions in light of the relevant
standards, the Court necessarily had to determine that (1)
general purpose credit and charge cards and general purpose
credit and charge card network services were the relevant
markets; (2) the United States was the appropriate geographic
scope of the relevant markets; (3) Visa and MasterCard each had
market power within the relevant markets; (4) the exclusionary
rules harmed competition and consumers; and (5) Visa and
MasterCard did not meet their burden to demonstrate a valid
procompetitive justification to justify the anticompetitive
effects of the exclusionary rules. Further, the Court
specifically found that the harm to competition was caused by

harm to Visa and MasterCard's major competitors, American

Express and Discover:

> First, the exclusionary rules cause an adverse effect on the issuing market by effectively preventing Visa and MasterCard member banks from issuing American Express and Discover cards, reducing overall card output and available card features. As a result, consumer welfare and consumer choice are decreased. Second and more importantly for this case, the rules restrain competition in the network market because they prevent American Express and Discover from offering network services to the consumers of those services, the members of the Visa and MasterCard associations. As a result, American Express and Discover are forced to operate as single-issuer networks, limiting their transaction and issuance volume and stunting their competitive vitality. Network services output is necessarily decreased and network price competition restrained by the exclusionary rules because banks cannot access the American Express and Discover networks; conversely American Express and Discover cannot access the issuing competencies and segmented marketing expertise of the banks, nor their more profitable relationship customers with checking accounts, attributes which cannot be provided by the smaller banks and monoline banks to which American Express and Discover do have access.

Visa I, 163 F. Supp. 2d at 379. See also Visa II, 344 F.3d at

240 ("The most persuasive evidence of harm to competition is the

total exclusion of American Express and Discover from a segment

of the market for network services.").

b.   Discover's Claim for Relief

Discover's first claim for relief in its Second Amended
Complaint ("Complaint") alleges that "Defendants, on behalf of
and in collaboration with their banks, have engaged in a
continuing combination and conspiracy to organize and operate
their general purpose card networks in a manner that restrains
competition among general purpose card networks in violation of
Section 1 of the Sherman Act, 15 U.S.C. § 1, as amended."
(Second Amended Compl. ¶ 94.)  According to the Complaint, "[i]n
furtherance of this combination and conspiracy, defendants and
certain of their banks have adopted and enforced 2.10(e) and the
CPP in order to disadvantage or exclude rival general purpose
card networks, such as Discover's network, from the general
purpose card network services market."  (Id. ¶ 95.)  And in this
claim, Discover alleges that "[a]s a result of defendants'
violations of Section 1, Discover has been substantially injured
in its business and property."  (Id. ¶ 99.)

c.    The Applicability of Collateral Estoppel

Having identified the determinations necessary to support
its judgment in the DOJ action, the Court now turns to whether
collateral estoppel should apply to those determinations with
respect to Discover's first claim for relief.

First, it is clear that Discover's first claim challenges
the same conduct challenged by the DOJ in its action against
Visa and MasterCard, and that these determinations were actually

litigated and decided in the DOJ action.  Defendants contend
that the issue of injury to Discover was not a necessary aspect
of the DOJ action because of its focus on harm to competition.
However this Court specifically held -- and the Second Circuit
emphasized -- that the harm to competition stemmed directly from
competitive harm to the two other major competitors, American
Express and Discover, in what was essentially a four-party
market.  It is also evident from Defendants' vigorous defense of
themselves before this Court and before the Second Circuit that
they have taken full advantage of every opportunity to litigate
these issues, and that they had every incentive to do so.  And
as illustrated above in section II.B.1.a, the determinations
made by the Court were required to satisfy the elements of the
DOJ's antitrust action, and were thus necessary to support the
judgment there.

Further, application of collateral estoppel as to these
determinations would serve judicial economy while remaining fair
to Defendants.  With respect to judicial economy, Defendants
have demonstrated clearly by their unwillingness to accept even
the most basic underpinnings of this Court's decision in the DOJ
action, that precluding them from relitigating those core
determinations would conserve judicial resources, despite the
fact that there may be substantial overlap in the evidence to
support the damages model and liability.  And in light of the

overlapping evidence, Defendants argue that giving collateral estoppel effect to a liability finding would unfairly prejudice the jury with respect to damages.  However, properly instructed, juries are capable of distinguishing between antitrust liability and damages caused thereby.  See, e.g., United States Football League v. National Football League, 842 F.2d 1335, 1376-77 (2d Cir. 1988) ("U.S.F.L.") (affirming jury award of nominal damages of $1 to Plaintiff following a liability finding, in light of a jury instruction that stated, inter alia, "[j]ust because you have found the fact of some damage resulting from a given unlawful act, that does not mean that you are required to award a dollar amount of damages resulting from that act. . . . you may find that plaintiffs failed to prove an amount of damages"). See also 4 Sand et al., Modern Federal Jury Instructions ¶ 79.02.[5] ("'Injury' differs from 'damages,' which are the means of measuring the injury in dollars and cents.  The plaintiff meets its burden of showing injury if it shows some damages from the unlawful activities complained of.  Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.").

Most of the other challenges by the Defendants pertain to the expansive nature of the collateral estoppel grant sought by Discover.  It bears emphasis that this Court's collateral estoppel ruling is limited in scope, to wit, solely to the

determinations outlined in section II.B.1.a that the Court has found were necessary to support its decision, and is thus narrower than Discover's request for an order "establishing as undisputed the elements of Discover's § 1 claim relating to credit network services." Additionally, the Court declines to impose upon its determination a specific timeframe -- the issue of temporal scope pertains more to the question of damages, and Defendants should not be prevented from making arguments as to events during the relevant time period that could affect the damage calculation. Finally, the Court declines to give collateral estoppel effect to the determinations encapsulated in Discover's Attachment A, concluding that the presentation to the jury of 81 individual statements in a vacuum and without context would be unfair to Defendants.

Thus, in sum, the Court will give collateral estoppel effect to the following determinations:

- General purpose credit and charge cards is a relevant market

- General purpose credit and charge card network services is a relevant market

- The United States is the appropriate geographic scope of the relevant markets

- Visa and MasterCard each had market power within the relevant markets

- Bylaw 2.10(e) and the CPP were each unlawful restraints of trade

- Bylaw 2.10(e) and the CPP harmed competition and consumers in the relevant markets by:

    o limiting output of Discover cards in the U.S.

    o restricting Discover's competitive strength by restraining merchant acceptance levels and their ability to distribute new features through exclusion from the network services market

    o foreclosing Discover from competing to issue off-line debit cards

    o depriving consumers of the ability to obtain credit cards that combine the unique features of their preferred bank with any of the four major network brands

## III. <u>Visa's Motions</u>

In its motions, Visa seeks summary judgment (1) dismissing all claims against it for failure to file within the time period required by the statute of limitations; (2) dismissing the third, fourth, and fifth claims for relief pertaining to alleged monopolization of debit network services; (3) precluding Discover from alleging any damages based on third-party acquiring claims; and (4) precluding Discover from alleging damages based on the failure of "Project Explorer."  Because there is substantial overlap with MasterCard's motions as to Visa's third and fourth motions for summary judgment, the Court will discuss those motions in tandem with MasterCard's arguments below.  For the reasons that follow, the Court DENIES Visa's

first motion and GRANTS Visa's second motion for summary judgment.

A.    Statute of Limitations

In this motion, Visa seeks dismissal of all claims against it for Discover's alleged failure to file within the statute of limitations.[1]  Visa also contends that at the least, the statute of limitations prevents Discover from pursuing its debit-related claims against Visa.  For the reasons that follow, this motion is DENIED in its entirety.

1.    Requirements

A private antitrust action must be "commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  "In the context of a continuing conspiracy to violate the antitrust laws, . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."  Id.  "[I]f a plaintiff feels the adverse impact of an

---

[1] MasterCard also moves in a footnote in its motions that "[f]or the reasons set forth in Visa's motion," that any claims for third-party acquiring based on the CPP should be time barred; this motion is DENIED for the reasons set forth in this section.

15

antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." Id. at 339.

"In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." Id. (emphasis added). "Generally, uncertain damages, which prevent recovery, are distinguishable from the uncertain extent of damage, which does not prevent recovery." Vitale v. Marlborough Gallery, No. 93 CIV 6276 (PKL), 1994 WL 654494, at *6 (S.D.N.Y. July 5, 1994).

With respect to tolling of the statute of limitations, "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, . . . the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter." 15

U.S.C. § 16(i) (emphasis added).  In determining whether a

private litigant should benefit from this toll, "care must be

exercised to insure that reliance upon the government proceeding

is not mere sham and that the matters complained of in the

government suit bear a real relation to the private plaintiff's

claim for relief."  Leh v. General Petroleum Corp., 382 U.S. 54,

59 (1965).  "In general, consideration of the applicability of

[the toll] must be limited to a comparison of the two complaints

on their face."  Id. at 65.  However, the conspiracy pleaded by

a private plaintiff need not have "the same breadth and scope in

time and participants as the conspiracy described in the

government action on which he relies."  Id. at 63.  "Although a

treble damage plaintiff usually chooses to incorporate only a

part of the Government case into his complaint, . . . there is

no logical reason why tolling should not also follow where the

plaintiff incorporates the entire Government case and alleges

more in addition.  In both instances the overlap between the

Government case and the private allegations suggests that

valuable practical benefits may flow to the private plaintiff

from tolling the statute."  In re Antibiotic Antitrust Actions,

333 F. Supp. 317, 321 (S.D.N.Y. 1971).

2.   Visa's Contentions

     Visa argues that the statute of limitations in this action

expired "no later than 1997" because "Discover admits it first

17

suffered harm in each of the three alleged relevant markets no later than 1993." In Visa's view, the triggering act was the enactment of Bylaw 2.10(e) in 1991, and once Discover knew of its existence and began to experience harm from it, Discover was required to file its action within four years of that date. The Court disagrees for two reasons. First, the record, viewed in the light most favorable to Discover, shows that Visa member banks engaged in several overt acts later than 1993 to further the alleged conspiracy, to wit, refusing to deal with Discover pursuant to 2.10(e). Under Discover's theory here, these acts caused it injury allowing for the accrual of a cause of action.

Second, and more importantly, Discover's claim for damages was entirely too speculative in 1993 for its action to accrue. Bylaw 2.10(e)'s effect was unmeasurable and speculative until it was actually used against Discover, regardless of when it was enacted. Under Discover's damages model, the damages, if any, did not crystallize until 1995 when Discover first initiated serious attempts to enter into third-party issuance deals, and was thwarted because of Bylaw 2.10(e). This situation thus fits squarely within the exception to the general statute of limitations rule enumerated in Zenith. And the DOJ action tolled the statute from the filing the complaint in October, 1998, until the denial of Visa and MasterCard's petition for

certiorari on October 4, 2004, whereupon Discover filed its
first complaint in this action.

Visa further contends that even if the Court finds the
statute of limitations inapplicable as to all of Discover's
claims, that it should at least enforce the statute of
limitations as to Discover's debit claims. According to Visa,
because the debit claims are for damages in a distinct market,
the toll provided for in 15 U.S.C. § 16(i) should not apply.
Although this Court is mindful of this "general rule that
limitations are not tolled when the government and subsequent
private suits . . . arose in distinct markets," Novell, Inc. v.
Microsoft Corp., 505 F.3d 302, 321 (4th Cir. 2007) (internal
quotation marks omitted), it nevertheless finds that the unique
circumstances here justify deviation from the general rule, in
light of the view that "effect must be given to the broad terms
of the [tolling] statute itself -- 'based in whole or in part on
any matter complained of' . . . -- read in light of Congress'
belief that private antitrust litigation is one of the surest
weapons for effective enforcement of the antitrust laws," Leh,
382 U.S. at 59 (internal quotation marks omitted).

Here, although the complaint in the DOJ action did not
specifically identify the debit market as a relevant market,
this Court nevertheless determined that the exclusionary rules
"effectively foreclose[d] . . . Discover from competing to issue

off-line debit cards," Visa I, 163 F. Supp. 2d at 329.  While
the Court emphasized that it did not conflate the debit and
credit markets, it highlighted the unique nature of debit
functionality vis-à-vis the network services market, to wit,
"the essentially free distribution system of the
Visa/Master[C]ard networks," id. at 393, that banks could take
advantage of to provide debit functionality.  Thus, the Court
"include[d] debit cards in its prohibition against the future
adoption of exclusionary rules" to prevent Defendants from
"accomplish[ing] the same anticompetitive goals of [the
exclusionary rules] through the backdoor of debit."  Id. at 408.

    Other than this expansion into debit functionality, the DOJ
action otherwise addressed the same general competitive harm, to
wit, the exclusionary rules, against the same Defendants and
otherwise overlaps substantially with the action here.  In light
of the manner in which debit functionality is intertwined with
and essentially "piggybacks" upon existing network services
capabilities, and the identity of the competitive harm and
defendants, the Court believes that tolling the statute of
limitations as to the debit claims is appropriate despite the
general "distinct markets" rule.

B.    The Debit Monopolization Claims

    In its motion for summary judgment as to Discover's debit
monopolization claims, Visa seeks the dismissal of the third,

fourth, and fifth claims in the Complaint.  For the reasons that follow, the Court GRANTS this motion.

1.  <u>Requirements for the Monopolization Claims</u>

The Complaint's third claim alleges monopoly maintenance, the fourth claim alleges an attempt to monopolize, and the fifth claim alleges a conspiracy to monopolize, all in violation of Section 2 of the Sherman Act.

Section 2 of the Sherman Act provides in relevant part for the imposition of liability upon "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 570-71 (1966).  "Monopoly power is the power to control prices or exclude competition, and is also referred to as a high degree of market power."  <u>Heerwagen v. Clear Channel Communications</u>, 435 F.3d 219, 226 (2d Cir. 2006) (internal quotation marks and citations omitted).  "It may be proven directly by evidence of the control of prices or the exclusion of competition, or it may

be inferred from one firm's large percentage share of the relevant market." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2d Cir. 1998). "While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." Id. (internal citation omitted).

"[T]o demonstrate attempted monopolization, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." Id.

A conspiracy claim pursuant to Section 2 "must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." Electronics Communications Corp. v. Toshiba America Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997) (internal quotation marks omitted).

With respect to all three claims, as with all private antitrust actions, Discover must demonstrate causation and antitrust injury attributable to an unlawful act.

2.   <u>Discover's Debit Monopolization Theory</u>

According to Discover's expert, Dr. Jerry Hausman, "[t]o protect its monopoly position, Visa took steps to exclude competing debit networks from a substantial portion of the market.  Visa caused banks to reissue tens of millions of debit cards that previously bore the marks of competing PIN debit networks as Visa/Interlink cards."  (Decl. of Jerry Hausman, Ex. A (Expert Report of Jerry Hausman) ("Hausman Report") ¶ 134.)  "Visa maintained its dominant position by entering into long term deals with major banks to make Interlink their exclusive, or in some cases primary, PIN debit network.  The terms of these deals were for five years or more."  (<u>Id.</u> ¶ 135.)  Further, "Visa documents demonstrate that for the first half of 2004 the total net issuer fees paid by the top 50 Interlink issuers were negative.  As a result, Visa consistently operated Interlink at a loss during this time frame, with Interlink reaching profitability only in 2007."  (<u>Id.</u>)  Hausman contends that "Visa also offered large, unprofitable payments to certain banks to encourage them to convert to Interlink and stop dealing with competing debit networks."  (<u>Id.</u> ¶ 136.)

3.   <u>Visa's Contentions</u>

Visa argues that Discover fails to articulate a valid theory as to how Visa's debit agreements violated the antitrust laws.  Visa notes that Discover's theory with respect to the

monopolization claims admittedly does not claim predation, and does not otherwise provide a valid basis for the monopolization claims. The Court agrees.

First, the Complaint itself does little to illuminate the nature of the allegedly unlawful act and its role in causing Discover harm on the debit monopolization claims. All three claims contain a conclusory citation to Bylaw 2.10(e) as the means by which Visa monopolized, and attempted and conspired to monopolize. But the Court finds that the link between Bylaw 2.10(e) and the alleged injury due to the monopolization claims is far too attenuated for it to serve as the requisite unlawful act.

This leaves two possibilities of unlawful acts to serve as the basis for these claims: Visa's use of "unprofitable payments" to induce banks to switch to Interlink, and Visa's use of exclusive agreements to foreclose Discover from the debit market. Discover has failed to adduce sufficient competent evidence that either act violates the antitrust laws; thus, neither act can serve as the basis for its monopolization claims.

With respect to the payment claim, Hausman admitted in his rebuttal report that he was "not claiming predation, but rather that Visa was willing to lose money on deals in order to achieve the broader strategic economic goal of higher debit

interchange." (Rubin Decl. Ex. D (Rebuttal Expert Report of Jerry A. Hausman) ¶ 83.) Discover argues in a footnote that its claims satisfy the "sacrifice test" (that it contends is "well-established") enumerated in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608 (1985), where the dominant firm forwent "short-run benefits because it was more interested in reducing competition . . . over the long-run by harming its smaller competitor."

Aspen Skiing is inapposite here. As the Supreme Court has recently recognized, "Aspen Skiing is at or near the outer boundary of § 2 liability," and imposes liability in large part "based on refusal to cooperate with a rival." Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408-09 (2004). The Supreme Court noted that "[t]he Court there found significance in the defendant's decision to cease participation in a cooperative venture," and characterized the holding of Aspen Skiing as a "limited exception." Id. at 409. Visa has never cooperated with Discover in the debit market, and its engagement in exclusive agreements with banks is not a sufficiently analogous harm as elaborated upon in Aspen Skiing for its "limited exception" to apply.

Thus, Discover's debit monopolization claims necessarily rely largely on the exclusive nature of the agreements as a means of foreclosing it from the debit market. In exclusive

dealing cases, "the competition foreclosed by the contract must
be found to constitute a substantial share of the relevant
market." Tampa Electric Co. v. Nashville Coal Co., 365 U.S.
320, 329 (1961). "For exclusive dealing, foreclosure levels are
unlikely to be of concern where they are less than 30 or 40
percent. . . . low numbers make dismissal easy . . . ." Stop &
Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373
F.3d 57, 68 (1st Cir. 2004).

Here, Discover attempts to suggest foreclosure of the
market by demonstrating that Visa entered into exclusive debit
agreements with thirteen big banks, and quoting from this
Court's statements in the SSF proceedings between Visa and
MasterCard that "[b]y early 2004, Visa had renewed long-term
contracts with most of its member banks, essentially locking up
89% of the volume of its top 100 debit issuers." First, as
noted by Visa's expert (and unrebutted by Discover), the
exclusive agreements with the thirteen banks account for 37% of
signature debit volume. (Rubin Reply Decl. Ex. R (Expert Report
of David Teece) ¶ 320.)

Discover's argument with respect to Visa's long-term
contracts with other issuers is problematic in several respects.
First, exclusive contracts locking up 89% of the volume of
Visa's top 100 debit issuers as against MasterCard is not
equivalent to a corresponding portion of the debit market as a

whole.  Second, and importantly, the exclusive agreements that
Visa made with these issuers were exclusive only vis-à-vis
MasterCard, and did not foreclose Discover at all.

Thus, the record shows that Discover has failed to adduce
sufficient evidence to support its debit monopolization claims
against Visa, and the Court accordingly GRANTS summary judgment
to Visa on them.

IV.  MasterCard's Motions

In its motions, MasterCard seeks summary judgment (1)
dismissing Discover's first claim against it because of
Discover's alleged failure to establish that the CPP was the
material cause of Discover's inability to enter into agreements
with issuers; (2) dismissing all claims against it for
Discover's alleged failure to adduce a competent damages model;
(3) dismissing Discover's first and fifth claims against
MasterCard to the extent that they allege an inter-associational
conspiracy with Visa; (4) dismissing all claims to the extent
that they allege injury in the debit market; (5) precluding
Discover from alleging any damages caused by the CPP's third-
party acquiring prohibition; and (6) precluding Discover from
alleging any damages attributable to the failure of "Project
Explorer."  For the reasons that follow, MasterCard's motions
are GRANTED in part and DENIED in part.

A.    The CPP as a Material Cause of Discover's Inability to
      Enter Issuing Agreements

MasterCard contends that the record before the Court

establishes that Visa's Bylaw 2.10(e) (enacted in 1991), and not

the CPP (enacted in 1996), was the material cause of Discover's

inability to enter into agreements with issuers, and that all

claims against it should accordingly be dismissed against it on

that basis.  The Court disagrees.

This argument requires little discussion.  Contrary to

MasterCard's assertions, this Court determined in Visa I that

the CPP was an illegal restraint of trade and independently

caused injury to competition.  The fact that Bylaw 2.10(e) was

already restraining trade at the time that the CPP was enacted

does not minimize the impact of the CPP's independent restraint

of trade.  After all, the CPP prevented MasterCard member banks

from issuing Discover and American Express cards, preventing

Discover from marketing its network services to any MasterCard

banks; the mere fact of substantially overlapping dual

membership is not dispositive.  A MasterCard bank unfettered by

the CPP could have considered whether the benefit of issuing

Discover or American Express cards would have outweighed the

harm from expulsion from Visa.  The actual amount of damages to

Discover, if any, resulting from this exclusion based on the CPP

is a matter for the jury.

B.    The Challenges to Discover's Damages Model

     MasterCard challenges Discover's damages model in its
entirety on two bases: (1) that it fails to sufficiently
distinguish between harm caused by MasterCard's allegedly
unlawful conduct and other factors (disaggregation); and (2)
that it fails to apportion damages between Visa's conduct and
MasterCard's conduct (apportionment).  For the reasons that
follow, the Court DENIES MasterCard's motion as to this issue.
Further, because the general analysis of the core damages model
on the issue of disaggregation necessarily implicates Visa and
MasterCard's motions to preclude Discover from alleging any
damages based on third-party acquiring, the Court addresses and
DENIES those motions here as well.

1.    Requirements for Damages Models in Antitrust Cases

     "[O]nce proof of injury causation has been established,
courts have allowed antitrust plaintiffs considerable latitude
in proving the amount of damages.  Proof of amount of damages
thus need not conform to a particular theory or model, and exact
proof of the amount of damages is not required."  U.S.F.L., 842
F.2d at 1378 (internal citation omitted).  "An antitrust
plaintiff must thus provide only sufficient evidence to support
a 'just and reasonable estimate' of damages."  Id.  The
"willingness to accept a degree of uncertainty in these cases
rests in part on the difficulty of ascertaining business damages

29

as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land.  The vagaries of the marketplace usually deny . . . sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."  J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 567 (1981).

The Supreme Court has noted that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946).  However, "[w]hatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts.  That latitude is thus circumscribed by the need for proof of causation."  U.S.F.L., 842 F.2d at 1378 (internal citation omitted).

"The [Supreme] Court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."  Zenith, 395 U.S. at 123-24 (internal

quotation marks omitted; emphasis added).  Thus, courts have

rejected damage models that inadequately demonstrate a causal

link between the allegedly unlawful activity and the losses

caused, by, inter alia, failing to take into account losses

attributable to market forces and lawful competition.  See,

e.g., Intimate Bookshop v. Barnes & Noble, Inc., No. 98 Civ.

5564 (WHP), 2003 WL 22251312, at *8 (S.D.N.Y. Sept. 30, 2003)

("As noted, [plaintiff]'s unsupported assumption of causation

and supposition that all of its losses were caused by

defendants' allegedly unlawful conduct, and failure to account

for defendants' lawful conduct and intervening market factors

are fatal to its claim."); Litton Systems, Inc. v. Honeywell,

Inc., No. CV 90-4823 MRP, 1996 WL 634213, at *3 (C.D. Cal. July

24, 1996) ("Because [plaintiff]'s damage model did not attribute

an amount of damages to particular [defendant] conduct, but

rather attributed a single estimate of damages to all of the

challenged conduct taken together -- even conduct that was

excluded from consideration by the jury -- the jury had no

rational basis to determine an appropriate damage award.").

2.   Overview of Discover's Damages Model

        Discover's damages model "quantif[ies] damages to Discover

under the following framework":

            Absent the exclusionary rules, Discover
            would have entered into third-party issuing
            deals with banks that would have issued

> credit cards and signature debit cards over
> Discover's network.  These deals would have
> led to increased volumes on Discover's
> network and profits for Discover.  In
> addition, these volumes would have permitted
> Discover to close its domestic merchant
> acceptance gap with Visa and MasterCard,
> enhancing the attractiveness of the network
> to issuers and increasing the profitability
> of Discover's network and issuing
> businesses.

(Hausman Report ¶ 148.)  The damages model "quantifies Discover's damages by examining the business opportunities and strategies that Discover would likely have pursued and implemented in a world without the exclusionary rules."  (Id. ¶ 149.)  In this but-for world, Discover's expert created two alternative scenarios.  In the primary model, "Discover enters into deals with credit card issuers in the but-for world. Discover would have earned margins on these third-party issuing deals, and [he] estimate[d] the lost profits from a network perspective."  (Id. ¶ 150.)  Further, the increase in issuance volumes "would have enabled Discover to close the domestic merchant acceptance gap.  Reducing the acceptance gap also results in damages to Discover's network and issuing businesses as holders of the Discover Card would have used their cards more and carried greater revolving balances if Discover had been more widely accepted."  (Id.)

Under this model, an increase in issuing volumes leads to greater merchant acceptance in two ways.  "First, greater

issuing volumes would have permitted Discover, in its own direct
acquiring efforts, to induce more merchants to accept Discover."
(Id. ¶ 185.)  "Second, greater issuing volumes would have
permitted Discover to use third-party acquirers to accelerate
its ability to gain domestic parity."  (Id. ¶ 186.)

Under Discover's alternative model, also known as the
"Project Explorer" model, "Discover enters into a joint venture
deal with Citibank, a prospective deal discussed between the
parties in the actual world."  (Id. ¶ 151.)  This model
"focus[es] on estimating the additional profits Discover would
have enjoyed had the exclusionary rules not existed and the
parties been able to enter into a joint venture agreement in the
but-for world."  (Id.)  As in the primary model, "[t]his
approach leads to lost profits for Discover from both a network
and issuing perspective."  (Id.)

3.   The Challenges to the Primary Damages Model

a.   Disaggregation/Third-Party Acquiring

MasterCard's challenges on the issue of insufficient
disaggregation are for the most part fact-intensive challenges
to the assumptions that are the foundation for Discover's
damages model.  And both Visa and MasterCard seek the preclusion
of any damages attributable to Discover's inability to engage
third-party acquirers, contending principally that there is an
insufficient link between the issuance bans encapsulated in the

exclusionary rules, and any inability to pursue third-party
acquirers.

With respect to disaggregation, Discover's damages model,
is not a generalized model that simply outlines damages in broad
strokes without attribution of causation as in <u>Litton Systems</u>,
for example.  On the contrary, it is a damages model that
attributes all of the economic harm to the challenged conduct,
to wit, the exclusionary effects of Bylaw 2.10(e) and the CPP.
Thus, the core issue is not a disaggregation issue, but rather,
as with the factual challenges to the third-party acquiring
theory, whether there is competent evidence at this stage to
support a causal link between the restriction on issuance
imposed by Bylaw 2.10(e) and the CPP and Discover's inability to
engage third-party acquirers.  The record before this Court,
viewed in the light most favorable to Discover, shows that there
is.

For example, Mike McCormack, an expert for Discover with
experience in the acquiring division at Wells Fargo Bank during
the 1990s, opined that "[n]etwork volumes -- or the reasonable
prospect of such volumes -- are an essential prerequisite for a
bank or other entity to acquire for a network" because
"acquiring involves the expenditure of resources to implement
and administer service. . . . [and] any such expenditure of
resources had to be cost-justified based on expected return and

profitability." (McCormack Decl. Ex. A ("McCormack Report") ¶
40.) Further, he observed that "when acquiring for a brand, the
third-party acquirer contracts directly with the merchant and
charges the merchant processing fees for deposited sales. The
acquirers' revenues are directly linked to the level of volume
the network generates in sales to merchants," and thus concluded
that "[i]f a network has flat or diminishing network volumes,
and no readily apparent means of accelerating growth, . . . an
acquirer's interest in full service acceptance for the brand is
severely diminished." (Id. ¶ 41.) The evidence, viewed in the
light most favorable to Discover, also shows that based on its
stalled growth in the mid-1990s, Discover seriously considered
third-party acquiring as a means of growth. (See, e.g., Decl.
of Jennifer M. Selendy Ex. 152 (Memorandum from William Hodges
to Tom Butler dated Apr. 27, 1995), at 4 ("In effect, management
should logically decide that more acquiring entities are
essential to reach parity. In effect, it would leverage the
same existing distribution structure that VISA/MC enjoys.").)
Finally, "Discover received inquiries from third-party acquirers
expressing interest in acquiring for Discover soon after the
exclusionary rules were eliminated and Discover's third-party
issuing deal with GE was announced." (Hausman Report ¶ 191.)
Eventually, Discover "entered into agreements with all of the
major acquirers in the United States." (Id. ¶ 192.)

This evidence, taken in the light most favorable to Discover, is enough to survive summary judgment on both MasterCard and Visa's third-party acquiring causation challenge and MasterCard's general disaggregation challenge. Discover has identified the existence of disputed issues of material fact on the issue of the exclusionary rules' causation of damages from third-party acquiring. In addition, as discussed above, the primary model does not suffer from disaggregation issues. It is not for this Court at this stage to assess the weight or credibility of Discover's evidence in support of or Visa's and MasterCard's challenges to causation specifically and the primary model generally; rather, these disputed issues of material fact should be resolved by the jury.

Indeed, because the causal link in Discover's damages model is intermingled with the background noise of other factors, such as MasterCard's acquiring ban, which has not been found to be unlawful, Discover will have to prove that it was the issuance ban that caused this particular antitrust injury. In other words, the entirety of damages stemming from the failure to engage in third-party acquiring must flow from the issuance ban, not the acquiring ban, which has never been found unlawful.

b. Apportionment

MasterCard also contends that Discover's damages model is deficient for its failure to apportion damages between Visa's

36

and MasterCard's conduct, arguing that the burden falls upon
Discover to do so.  Discover claims that Visa and MasterCard
should be jointly and severally liable for their material
contributions to what Discover contends is an indivisible
injury.  The Court agrees that the indivisible injury analogy is
apt here, and thus DENIES MasterCard's motion as to this issue.

"[W]here two or more joint tortfeasors act independently
and cause a distinct or single harm, for which there is a
reasonable basis for division according to the contribution of
each, then each is liable for damages only for its own portion
of the harm.  In other words, the damages are apportioned. But
where each tortfeasor causes a single indivisible harm, then
damages are not apportioned and each is liable in damages for
the entire harm."  United States v. Alcan Aluminum Corp., 990
F.2d 711, 722 (2d Cir. 1993).  As illustrated by the Restatement
(Second) of Torts,

> [c]ertain kinds of harm, by their very
> nature, are normally incapable of any
> logical, reasonable, or practical division.
> Death is that kind of harm, since it is
> impossible, except upon a purely arbitrary
> basis for the purpose of accomplishing the
> result, to say that one man has caused half
> of it and another the rest.  The same is
> true of a broken leg, or any single wound,
> or the destruction of a house by fire, or
> the sinking of a barge. . . . Where two or
> more causes combine to produce such a single
> result, incapable of division on any logical
> or reasonable basis, and each is a
> substantial factor in bringing about the

> harm, the courts have refused to make an
> arbitrary apportionment for its own sake,
> and each of the causes is charged with
> responsibility for the entire harm.

Restatement (Second) of Torts § 433A cmt. i (1965). And

"[w]here the tortuous conduct of two or more actors has combined

to bring about harm to the plaintiff, and one or more of the

actors seeks to limit his liability on the ground that the harm

is capable of apportionment among them, the burden of proof as

to the apportionment is upon each such actor." Id. § 433B(2).

Although there may indeed be injuries suffered by Discover

in the period before the enactment of the CPP which only Visa

can be held liable for, it is clear to the Court that upon the

enactment of the CPP, the injury suffered by Discover was

indivisible as to the Defendants here.  Specifically, the injury

alleged in the damages model proffered by Discover is a single

harm incapable of logical division, substantially contributed to

both by 2.10(e) and the CPP.

C.    The Inter-Associational Conspiracy Claims

MasterCard seeks the dismissal of Discover's first and

fifth claims to the extent that they allege that MasterCard

engaged in an inter-associational conspiracy with Visa,

contending that Discover has failed to adduce sufficient

evidence tending to exclude the possibility of independent

action as required to prove antitrust conspiracy claims.  The
Court agrees and GRANTS this portion of MasterCard's motion.

1.   Principles

     Although it is true that "[o]n summary judgment the
inferences to be drawn from the underlying facts . . . must be
viewed in the light most favorable to the party opposing the
motion," "antitrust law limits the range of permissible
inferences from ambiguous evidence in a § 1 case."  Matsushita
Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574,
587-88 (1986) (internal quotation marks omitted; alteration in
original).  The Supreme Court has therefore held that "conduct
as consistent with permissible competition as with illegal
conspiracy does not, standing alone, support an inference of
antitrust conspiracy."  Id. at 588.  "To survive a motion for
summary judgment or for a directed verdict, a plaintiff seeking
damages for a violation of § 1 must present evidence 'that tends
to exclude the possibility' that the alleged conspirators acted
independently."  Id.  "[I]n other words, [an antitrust
plaintiff] must show that the inference of conspiracy is
reasonable in light of the competing inferences of independent
action or collusive action that could not have harmed
[plaintiff]."  Id.  "The mere opportunity to conspire does not
by itself support the inference that such an illegal combination

actually occurred."  Capital Imaging Associates, P.C., 996 F.2d
at 545.

2.  MasterCard's Contentions

MasterCard contends that Discover has failed to adduce any
direct evidence of a conspiracy, or any circumstantial evidence
sufficient to exclude the possibility that "MasterCard
unilaterally enacted the CPP to protect its own business
interests."  Discover argues that there is sufficient direct
evidence of a conspiracy in the form of "communicat[ions] about
the CPP with the people who effectively ran Visa --
representatives of banks of the Visa Board and of large Visa
issuers," and "threaten[ed] . . . loss of business" by key Visa
issuers and banks," in light of its view that any inference of a
conspiracy need only be "reasonable."  Discover's argument is
based on a misstatement of the applicable standard; viewed in
light of the correct standard, Discover's evidence is
insufficient to support an inference of an antitrust conspiracy.

As noted above, an antitrust plaintiff must adduce evidence
that tends to exclude the possibility of independent action.
Here, Discover fails to meet that burden.  In support of its
argument, Discover proffers the following evidence that it
contends supports a reasonable inference that a conspiracy
existed: (1) threats by MasterCard members who were also large
Visa issuers to MasterCard's CEO that they "would pull share

from MasterCard and shift it to Visa if MasterCard did not enact the CPP"; (2) the solicitation at a MasterCard committee meeting of MasterCard's largest issuers by MasterCard's general counsel of the views of various MasterCard issuers who were also large Visa issuers and Visa board banks as to whether MasterCard should adopt the CPP; (3) a survey by MasterCard's management of banks who were "key" MasterCard members, including several major Visa Board banks, to determine their views as to whether MasterCard should pass an issuing prohibition. Central to Discover's analysis of this evidence is the necessary inference that these banks, which Discover describes as Visa issuers and Visa board banks, were "acting as controlling representatives of Visa -- and not simply as MasterCard customers -- when they pressured MasterCard into passing the CPP." First, there is no direct evidence in the record to support the characterization of these MasterCard banks acting as controlling representatives of Visa. Second, there is no evidence of any explicit agreement between Visa and MasterCard to enact the CPP. And, importantly, these actions are circumstantial evidence that is equally consistent with MasterCard acting unilaterally to protect its own business interests.

Contrary to Discover's assertions, it has failed to show that the evidence tends to exclude the possibility of independent action, especially in light of the rest of the

41

record before this Court.  Discover's argument hinges in large part upon the imputation of conspiratorial motives merely by dint of the overlapping membership of several banks in both the Visa and MasterCard associations, and the assumption that any pressure placed by those banks was done so to further Visa's, rather than MasterCard's, best interests.  The fact of duality alone does not permit such a series of speculative inferences; indeed, the argument that the enactment of the CPP was an indicator of the anticompetitive effects of duality was specifically rejected by this Court in Visa I.  See Visa I, 163 F. Supp. 2d at 374 ("[A] fair examination of the voting pattern demonstrates no correlation between skew [of distribution of card portfolio between Visa and MasterCard] and the vote on the CPP.  An examination of the votes of the eight Board members with the highest skews -- who plaintiff presumes would have similar incentives because of their skew levels -- reveals that members of equal or similar skew voted differently.").

In light of this determination, the fact that MasterCard solicited the views of its major banks prior to enacting the CPP cannot tend to exclude the possibility of independent action, leaving only the threats by MasterCard members who were Visa issuers to MasterCard's CEO that they would shift share to Visa absent the enactment of the CPP as evidence to support Discover's conspiracy theory.  This proffered evidence also

fails to tend to exclude the possibility of independent action; even viewing these threats in the light most favorable to Discover by declining to credit MasterCard's CEO's deposition testimony that he did not take the threats seriously, they are insufficient to support an inference of conspiratorial rather than independent action in light of the vast record evidence showing the careful process undertaken to enact the CPP and the lack of correlation between card-skew and voting preferences for the CPP.

Indeed, the above-described evidence is circumstantial evidence that is equally consistent with MasterCard unilaterally enacting the CPP in order to protect the MasterCard network and brand against the potential loss of business to competitors such as American Express and Visa.  It is of obvious significance that the enactment of the CPP came on the heels of a speech given in May, 1996 by Harvey Golub, American Express's CEO, in which he urged U.S. banks to join the American Express network, noting that while Visa had a rule prohibiting its banks from doing so, that MasterCard had no such policy; MasterCard has produced an abundance of evidence to support this position.

Thus, while MasterCard's enactment of the CPP five years after Bylaw 2.10(e) was unlawful, there is insufficient evidence tending to exclude the possibility that the enactment of the CPP was the product of a conspiracy with Visa.

D.   The Debit Claims as to MasterCard

MasterCard seeks dismissal of Discover's debit-related claims, contending that summary judgment is warranted because the CPP never applied to debit and Discover fails to adduce competent evidence of any other conduct by MasterCard that caused Discover injury in the debit market.  For the reasons that follow, the Court agrees and GRANTS MasterCard's motion for summary judgment dismissing the debit claims against it.

First, it is undisputed that the CPP never applied to debit.  While Discover attempts to create a disputed issue of fact in this regard by quoting a bank executive who "thought the CPP applied to debit," its attempt is wide of the mark.  The fact that a single bank executive was under a mistaken impression does not change the fact that by its very terms, the CPP did not apply to debit.

Discover also argues that "even if the CPP did not apply to debit, it caused injury in the debit market by shoring up By-law 2.10(e)," relying on its theory as to the inter-associational conspiracy claim.  Even if the Court found that there were material issues of fact as to an inter-associational conspiracy to restrict issuing -- which it does not -- there is no evidence in the record as to any understanding or agreement between Visa and MasterCard to prohibit Discover's access to the debit market.

Finally, Discover has failed to adduce evidence to establish the necessary elements of a claim as to the debit market.  None of its experts have put forth any evidence that MasterCard had market power in the debit market, that MasterCard engaged in any conduct that had an anticompetitive effect in the debit market, that Discover suffered an antitrust injury in the debit market as a result of MasterCard's conduct, or that Discover suffered any damages in the debit market attributable to MasterCard.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Discover's motion for partial summary judgment; DENIES Visa's motion seeking dismissal of all claims against it as time barred; GRANTS Visa's motion seeking the dismissal of the third, fourth, and fifth claims against it; DENIES MasterCard's motion seeking the dismissal of Discover's first claim for failure to establish that the CPP was a material cause of Discover's inability to enter into agreements with issuers; DENIES MasterCard's motion seeking the dismissal of all claims for failure to adduce a competent damages model; DENIES Visa's and MasterCard's motion to preclude Discover from alleging damages based on third-party acquiring; GRANTS MasterCard's motion seeking dismissal of Discover's first and fifth claims against it to the extent that they allege an inter-asociational

conspiracy with Visa; and GRANTS MasterCard's motion seeking the

dismissal of claims against it to the extent that they allege

injury in the debit market.

**SO ORDERED:**

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

Dated:     New York, New York
           August 20, 2008